IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JUSTIN BEAUREGARD,

*Plaintiff,*

v.

BROADWAY ELECTRIC SERVICE
CORPORATION,

*Defendant.*

Civil Action No. 2:21-cv-1600

Hon. William S. Stickman IV

## **MEMORANDUM OPINION**

WILLIAM S. STICKMAN IV, United States District Judge

Plaintiff Justin Beauregard ("Beauregard") filed this putative class action under the Pennsylvania Minimum Wage Act ("PMWA"), 43 P.S. §§ 333.101–333.115, against Defendant Broadway Electric Service Corporation ("BESCO") in the Court of Common Pleas of Beaver County, Pennsylvania.  In the single-count Complaint, Beauregard asserts, on behalf of himself and others similarly situated, that BESCO violated the PMWA by failing to pay overtime wages to hourly employees for required activities before their scheduled start time and after their scheduled end time.  (ECF No. 1-1, ¶¶ 19–24).  BESCO removed the case to this Court.  *See* 28 U.S.C. § 1441.  (ECF No. 1).  It then filed a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6), asserting that Beauregard's PMWA claim is preempted by Section 301 of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185.  (ECF No. 8).  For the reasons below, the Court holds that the PMWA claim is not preempted by LMRA. Accordingly, BESCO's Motion to Dismiss will be denied.

1

# I.  BACKGROUND

Shell Polymers, a subsidiary of Shell Oil Company, is currently constructing a large petrochemical facility in Monaca, Pennsylvania ("Monaca facility").  (ECF No. 1-1, ¶ 5).  Work at the Monaca facility is governed by a Project Labor Agreement ("PLA"), which consists of several collectively bargained agreements, including the National Construction Agreement and various addendums, interpretations, and memoranda of understanding.  (*See* ECF No. 9-1).[1]  The PLA requires contractors to employ "members of the local construction unions" and sets forth the terms and conditions of employment at the Monaca facility.  (*Id.* at 3).  Several provisions of the PLA—specifically, the Site Conditions Addendum—are relevant here:

**3) Hours of Work-Article 8-**

    a) Except as provided in subsection d, the first shift shall consist of eight (8) or ten (10) hours per day between the hours of 6:00 a.m. and 5:30 p.m., plus one-half (1/2) hour for unpaid lunch, approximately mid-way through the shift. Forty (40) hours per week shall constitute a regular week's work, whether consisting of five (5) eight (8) hour days, or a four (4) ten (10) hour days.  A uniform starting time will be established for all crafts on each project or segment of work. . . .

. . .

    c) Employees shall be at their place of work at the starting time and shall remain at their place of work (as designated by the Employer) performing their assigned functions until quitting time, which is defined as the scheduled end of the shift.  Employees are in on Employee time and out on Employer Time.  The

---

[1] Generally, "a district court ruling on a motion to dismiss [under Rule 12(b)(6)] may not consider matters extraneous to the pleadings."  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (Alito, J.).  However, there are a few exceptions to that general rule, and the PLA falls within one such exception.  Though the Complaint makes no reference to the PLA, it is an "undisputedly authentic document" that BESCO attached to its Motion to Dismiss.  *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).  This document, moreover, is "integral" to and "potentially dispositive" of Beauregard's unpaid wages claim, as "the dispute unquestionably arises out of [his] employment," which is governed by the PLA (at least in part).  *Hughes v. UPS*, 639 F. App'x 99, 103 (3d Cir. 2016).  The Court may, therefore, properly consider the PLA at this stage of the litigation.

parties reaffirm their policy of a fair day's work for a fair day's wage. There shall be no pay for time not worked unless the employee is otherwise engaged at the direction of the Employer. Due to the magnitude of the Project and congestion of the site, staggered starting times may be required. If necessary, these starting times would be between 6:00 a.m. and 8:00 a.m. This policy could help reduce the transportation problems at start and completion times.

    d) Employer Furnished Transportation- e.g. from a remote parking lot or common park and ride area, the employer will furnish transportation to the project entrance prior to the shift starting time and the Employer will furnish transportation from the exit gate to the remote parking facility or park and ride location at the shift quitting time. All transportation by the Employer will be on employee's time. There will be no compensation. Bus Schedules will be established prior to the pre-job conference and included in the pre-job conference meeting with the Building Trades, to ensure the bus schedules afford employees to arrive at the gate prior to the beginning of shift. The Employer will provide timely transportation, when employees exit the project gates at the end of the shift, back to the remote parking or park and ride area. There will be no compensation.

    e) Overtime shall be defined as all hours worked in excess of forty (40) hours in a week, or for 8-hours shifts, for work in excess of 8 hours per day; or for 10-hour shifts, for work in excess of 10 hours per day; such work and work performed on Saturday shall be paid at one and one-half times the straight time rate of pay, provided the employee has worked forty (40) hours since the start of the work week. . . .

. . .

## 7) General Working Conditions-Article 18-

    a) Employees shall be at their assigned place of work (as designated by the Employer) with their tools and ready to begin work at the starting time and shall remain at their place of work performing their assigned functions under the supervision of the Employer (s) until quitting time.

. . .

## 8) Safety-Article 19-

    a) Employees are required to provide and wear safety boots that are above the ankle, lace up style with protective toe-caps and non-perforating midsoles compliant with ANSI Z41-1991. No compensation will be paid for craft providing their own work boots.

b) Long sleeve shirts are required by all personnel.  Specific employees performing specific skills will be required to be uniform in appearance e.g. Flaggers in red vests, Fire Watches in orange vests, Riggers in green vests, HSSE personnel in red hard hats, etc. as defined by the Employer.  Each craft worker will be identified by trade using color band around the hard hat to distinguish the trade, and foreman will be identified using a single vertical stripe of the same color on each side of the hard hat, and General Foreman will be identified using two vertical stripes of the same color on each side of the Hard Hat.  Hard Hats will be identified on the front of the hat with the Employer logo and the first name of the employee with his/her craft and badge no. on the back of the hard hat.

c) When process hydrocarbons are present on site, employees will be required to wear "Employer Provided" Fire Retardant Clothing (RFC).

. . .

(ECF No. 9-1, pp. 56–57, 62–64).  The PLA also contains a "Grievance Adjudication Procedure" that applies "in the event any disputes arise out of the interpretation of this Agreement." (*Id.* at 90).  Specifically, the PLA provides that any grievance must be "called to the attention" of the employer or the union "within five (5) calendar days after the alleged violation was committed." (*Id.*).  Thereafter, grievances are subject to a multi-step review process involving union and employer representatives and must ultimately be resolved through "final and binding arbitration." (*Id.*).

BESCO, an electrical services contractor, employed individuals who were paid an hourly wage to perform work at the Monaca facility.  (ECF No. 1-1, ¶¶ 2, 6).  Beauregard was one such employee, and he actively worked at the Monaca facility on a full-time basis from January 2021 to September 2021.  (*Id.* ¶ 7).  Beauregard's employment was thus subject to the PLA. Beauregard alleges that he and other hourly employees "typically worked over 40 hours per workweek."  (*Id.* ¶ 8).  However, according to Beauregard, BESCO failed to pay "any compensation for required activities before their scheduled start time and required activities after their scheduled end time."  (*Id.* ¶ 24).  Pre-start time activities included "waiting at an assigned

parking lot for a shuttle bus, riding a shuttle bus from the parking lot to the Monaca facility, reporting to an assigned facility/lunch area, obtaining and donning personal protective equipment at the facility/lunch area, and walking or riding a vehicle onsite from the facility/lunch area to the initial job assignment." (*Id.* ¶ 10). Post-end time activities were the same, but in reverse—*i.e.*, "walking from the last job assignment to the assigned facility/lunch area," "doffing and storing personal protective equipment at the facility/lunch area," and "waiting for and riding the shuttle bus to the assigned parking lot." (*Id.* ¶ 11). Beauregard further alleges that "[p]arking at the assigned parking lot [was] required." (*Id.* ¶ 10). There, employees were "required to swipe a security badge to enter the shuttle bus loading area." (*Id.*). "This time [was] recorded for security purposes (but not compensation purposes)." (*Id.*). Upon arrival at the job site, employees [were] again required to swipe a security badge, "but [that did] not trigger the start of paid time." (*Id.*). Rather, until the employees "arrive[d] at the job assignment location on site by the scheduled start time, no compensation [was] paid." (*Id.*).

In October 2021, Beauregard filed suit in state court on behalf of himself and other hourly employees of BESCO who worked at the Monaca facility "during the past three years." (*Id.* ¶ 12). He asserts that BESCO's failure to pay them overtime wages for required activities violated the PMWA. (*Id.* ¶ 24). *See* 43 P.S. §§ 333.104, 333.113. BESCO removed the case to this Court[2] and subsequently filed a Motion to Dismiss under Rule 12(b)(6). (ECF Nos. 1, 8).

---

[2] BESCO points to three jurisdictional grounds as the basis for removal: (1) Class Action Fairness Act ("CAFA") diversity jurisdiction, 28 U.S.C. § 1332(d); (2) traditional diversity jurisdiction, *id.* § 1332(a); and (3) federal-question jurisdiction pursuant to the LMRA, *id.* § 1331; 29 U.S.C. § 185(a); *see also Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004) ("LMRA § 301 converts state causes of action into federal ones for purposes of determining the propriety of removal."). (ECF No. 1, pp. 2–4). The Court finds that it has subject-matter jurisdiction under the first and second grounds, but not the third. This action qualifies for CAFA diversity jurisdiction based on the undisputed allegations that the putative class contains more than 100 members, that the aggregate amount in controversy exceeds $5,000,000, and that

## II.  STANDARD OF REVIEW

A motion to dismiss filed under Rule 12(b)(6) tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  A plaintiff must allege sufficient facts that, if accepted as true, state a claim for relief plausible on its face.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A court must accept all well-pleaded factual allegations as true and view them in the light most favorable to a plaintiff.  *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009); *see also DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 262–63 (3d Cir. 2008).  Although a court must accept the allegations in the complaint as true, it is "not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation."  *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (citations omitted).

The "plausibility" standard required for a complaint to survive a motion to dismiss is not akin to a "probability" requirement but asks for more than sheer "possibility."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  In other words, the complaint's factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations are true even if doubtful in fact.  *Twombly*, 550 U.S. at 555.  Facial plausibility is present when a plaintiff pleads factual content that allows the court to draw the reasonable

---

minimal diversity of citizenship exists between Beauregard (a citizen of Pennsylvania) and BESCO (a citizen of Tennessee). *See Neale v. Volvo Cars of N.A., LLC*, 794 F.3d 353, 357 n.1 (3d Cir. 2015) (where no challenge is raised to "jurisdictional facts," they are controlling unless "it is clear to a legal certainty that the plaintiff cannot recover the amount claimed" (citation omitted)).  This action also qualifies for traditional diversity jurisdiction: the amount in controversy exceeds $75,000, and there is complete diversity of citizenship between Beauregard and BESCO.  But this action does not qualify for federal-question jurisdiction based on the LMRA.  Rather, the Court holds (as explained below) that the LMRA is inapplicable to Beauregard's PMWA claim.  *See Caterpillar, Inc. v. Williams*, 482 U.S. 386, 399 (1987) ("[A] defendant cannot, merely by injecting a federal question into an action that asserts what is plainly a state-law claim, transform the action into one arising under federal law." (emphasis removed)).

inference that a defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678. Even if the complaint's well-pleaded facts lead to a plausible inference, that inference alone will not entitle a plaintiff to relief. *Id.* at 682. The complaint must support the inference with facts to plausibly justify that inferential leap. *Id.*

### III.  ANALYSIS

In support of its Motion to Dismiss, BESCO contends that Beauregard's PMWA claim is preempted by Section 301 of the LMRA because the claim is "inextricably tied to an interpretation of several provision[s] set forth in the PLA." (ECF No. 9, p. 3). BESCO maintains that the Complaint must be dismissed with prejudice, and "the task of interpreting the collective bargaining agreement must be performed by an arbitrator, not a district court judge." (*Id.* at 3, 24). Beauregard responds that LMRA preemption is inapplicable because "resolution of this particular PMWA claim as plead[ed] by Plaintiff does not require *interpretation* of the PLA." (ECF No. 11, p. 2). As explained below, the Court holds that Beauregard's PMWA claim is not preempted by the LMRA. The Court will, therefore, deny BESCO's motion.

#### A.  Relevant Federal and State Law

##### 1.  Pennsylvania Minimum Wage Act

The wages of employees in the United States are governed by both federal and state law. The federal Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201–219, establishes "a national floor under which wage protections cannot drop." *Chevalier v. Gen. Nutrition Ctrs., Inc.*, 220 A.3d 1038, 1055 (Pa. 2019) (quoting *Bayada Nurses, Inc. v. Dep't of Lab. & Indus.*, 8 A.3d 866, 883 (Pa. 2010)). But the FLSA does not preclude states from "enact[ing] more beneficial wage and hour laws." *Id.*; *see also* 29 U.S.C. § 218 (providing that the FLSA does not "excuse noncompliance with any Federal or State law or municipal ordinance establishing a

minimum wage higher than the minimum wage established under [the FLSA]"); *Verma v. 3001 Castor, Inc.*, 937 F.3d 221, 232 (3d Cir. 2019) (explaining that "the general presumption [is] that the FLSA is a parallel regime of wage-and-hour protections that works in cooperation with, not to the exclusion of, other laws protecting workers"). Accordingly, the Pennsylvania General Assembly endeavored to provide "more generous protections" to employees through enactment of the Pennsylvania Minimum Wage Act of 1968, 43 P.S. §§ 333.101–333.115. *Chevalier*, 220 A.3d at 1055 (citation omitted). The PMWA "manifests th[e] Commonwealth's strong public policy protecting an employee's right to be adequately compensated for all hours for which they work." *Heimbach v. Amazon, Inc.*, 255 A.3d 191, 200 (Pa. 2021); *see also* 43 P.S. § 333.101 ("The evils of unreasonable and unfair wages as they affect some employe[e]s employed in the Commonwealth of Pennsylvania are such as to render imperative the exercise of the police power of the Commonwealth for the protection of industry and of the employe[e]s employed therein and of the public interest of the community at large.").

The PMWA largely mirrors the FLSA. *LaRue v. Great Arrow Builders LLC*, 2020 WL 5747818, at *11 (W.D. Pa. Sept. 25, 2020). As such, Pennsylvania and federal courts look to FLSA cases for guidance when interpreting substantially parallel provisions of the PMWA. *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 142 (3d Cir. 2020) (citing *Dep't of Lab. & Indus. v. Stuber*, 822 A.2d 870, 873 (Pa. Cmwlth. 2003), *aff'd*, 859 A.2d 1253 (Pa. 2004)). Nevertheless, given "the General Assembly's declared policy objective in enacting the PMWA," the Supreme Court of Pennsylvania has several times declined to "follow the interpretation of similarly applicable provisions of the federal FLSA" when interpreting more favorable provisions of the PMWA. *Heimbach*, 255 A.3d at 201 (citing *Chevalier*, 220 A.3d at 1055–58, and *Bayada*, 8 A.3d at 882–83). In those cases, the Supreme Court of Pennsylvania emphasized that "the

PMWA must be interpreted in accordance with its owns specific terms," which requires "examin[ing] the text of the PMWA, as well as the relevant Department of Labor and Industry regulations." *Id.* at 202.

The PMWA provides that "[e]very employer shall pay to each of his or her employe[e]s wages for all hours worked . . . ." 43 P.S. § 333.104(a). It further provides that employees "shall be paid for overtime not less than one and one-half times the employe[e]'s regular rate . . . for hours in excess of forty hours in a workweek." *Id.* § 333.104(c). The statute does not itself define "hours worked." *Heimbach*, 255 A.3d at 203. But the term has been defined by regulation:

> *Hours worked*—The term includes [1] time during which an employee is required by the employer to be on the premises of the employer, [2] to be on duty or to be at the prescribed work place, [3] time spent in traveling as part of the duties of the employee during normal working hours and [4] time during which an employee is employed or permitted to work; provided, however, that time allowed for meals shall be excluded unless the employee is required or permitted to work during that time, and provided further, that time spent on the premises of the employer for the convenience of the employee shall be excluded.

34 Pa. Code § 231.1(b) (numbers added). According to the plain language of the regulation, "all time which an employee spends performing any one of these four types of activity constitutes hours worked." *Heimbach*, 255 A.3d at 204. With respect to the first activity, "th[e] regulation specifically designates *all* 'time during which an employee is required by the employer to be on the premises of the employer' as compensable hours worked, regardless of whether the employee is actually performing job-related duties while on the premises." *Id.* The Supreme Court of Pennsylvania thus held in *Heimbach*, for example, that "time spent on an employer's premises waiting to undergo, and undergoing, mandatory security screening constitutes 'hours worked' under the PMWA." *Id.* at 193, 204.

To state a claim for unpaid wages under the PMWA, a plaintiff must prove three elements: (1) the plaintiff was an employee; (2) the defendant was the plaintiff's employer; and (3) the defendant failed to pay the plaintiff the wage required by the PMWA. *See* 43 P.S. § 333.103 (defining "employer" and "employe[e]"); *id.* § 333.104 (setting forth minimum and overtime wages); *see also, e.g.*, *Wintjen v. Denny's, Inc.*, 2021 WL 5370047, at *12 (W.D. Pa. Nov. 18, 2021). If a plaintiff seeks unpaid overtime wages, he or she must "sufficiently allege forty hours of work in a given workweek as well as some uncompensated time in excess of the forty hours." *Bansept v. G&M Auto.*, 434 F. Supp. 3d 253, 258 (E.D. Pa. 2020) (cleaned up). A plaintiff need not "identify the exact dates and times that [he or] she worked overtime." *Id.* (quoting *Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 243 (3d Cir. 2014)). Instead, a plaintiff may allege that he or she "'typically' worked forty hours per week, worked extra hours during such a forty-hour week, and was not compensated for extra hours beyond forty hours he or she worked during one or more of those forty-hour weeks." *Id.* at 258–59.

### 2. Labor Management Relations Act

Section 301(a) of the Labor Management Relations Act of 1947 provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). As interpreted by the Supreme Court, this provision of the LMRA has both jurisdictional and substantive effect. *Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 450–51 (1957); *see also Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 642–43 (1981). First, it vests federal district courts with jurisdiction over certain labor-management disputes. *Textile Workers*, 353 U.S. at 450; *see also Textron Lycoming Reciprocating Engine Div. v. United Auto.*, 523 U.S. 653, 656–57 (1998) ("By its terms, this

provision confers federal subject-matter jurisdiction only over 'suits for violation of contracts.'"). And second, it "authorizes federal courts to fashion a body of federal law for the enforcement of [] collective bargaining agreements and includes within that federal law specific performance of promises to arbitrate grievances under collective bargaining agreements." *Textile Workers*, 353 U.S. at 451; *see also id.* at 456 ("The substantive law to apply in suits under § 301(a) is federal law, which the courts must fashion from the policy of our national labor laws."). The Supreme Court has explained that "the subject matter of § 301(a) 'is peculiarly one that calls for uniform law.'" *Local 174, Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Lucas Flour Co.*, 369 U.S. 95, 103 (1962) (citation omitted). Otherwise, "[t]he possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements." *Id.*

From that need for uniformity comes the doctrine of complete preemption under the LMRA (also known as LMRA preemption or Section 301 preemption). This doctrine provides that "substantive principles of federal labor law [are] paramount in the area covered by the statute," meaning that "federal labor law . . . prevail[s] over inconsistent local rules." *Id.* The Supreme Court has explained that "the pre-emptive force of § 301 is so powerful as to displace entirely any state cause of action 'for violation of contracts between an employer and a labor organization.'" *Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 23 (1983). Accordingly, a suit "alleging a violation of a provision of a labor contract must be brought under § 301 and [] resolved by reference to federal law." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 210 (1985). And if a "state rule [] purports to define the meaning or scope of a term in a [labor] contract suit," it is "pre-empted by federal labor law." *Id.*

Significantly, LMRA preemption "extend[s] beyond suits alleging contract violations." *Id.* It also applies to state-law claims that are "substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract." *Id.* at 220; *see also Caterpillar,* 482 U.S. at 394 ("Section 301 governs claims founded directly on rights created by collective-bargaining agreements, and also claims 'substantially dependent on analysis of a collective-bargaining agreement.'" (citation omitted)). But such an extension of LMRA preemption is "narrow." *Lueck,* 471 U.S. at 220. "[N]ot every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is pre-empted by § 301." *Id.* at 211. Rather, "it would be inconsistent with congressional intent under that section to pre-empt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract." *Id.* at 212; *see also Livadas v. Bradshaw,* 512 U.S. 107, 123 (1994) (stating that "§ 301 cannot be read broadly to pre-empt nonnegotiable rights conferred on individual employees as a matter of state law").

The question thus becomes—as assessed "on a case-by-case basis"—whether the state-law claim "confers nonnegotiable state-law rights on employers or employees independent of any right established by contract, or, instead, whether evaluation of the [state-law] claim is inextricably intertwined with consideration of the terms of the labor contract." *Lueck,* 471 U.S. at 213, 220. In determining whether a state-law claim is "independent" of a collective bargaining agreement, a court must consider the "legal character of [the] claim" as opposed to its factual underpinnings. *Livadas,* 512 U.S. at 123. In other words, "even if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 pre-

emption purposes." *Lingle v. Norge Div. of Magic Chef*, 486 U.S. 399, 409–10 (1988).

Moreover, mere consultation of a collective bargaining agreement does not trigger LMRA

preemption. *See Livadas*, 512 U.S. at 124 ("[W]hen the meaning of contract terms is not the

subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the

course of state-law litigation plainly does not require the claim to be extinguished."). "[A]n

application of state law is preempted by § 301 of the [LMRA] only if such application requires

the *interpretation* of a collective-bargaining agreement." *Lingle*, 486 U.S. at 413 (emphasis

added). Under those circumstances, the state-law claim "must either be treated as a § 301 claim

or dismissed as pre-empted by federal labor-contract law." *Lueck*, 471 U.S. at 220 (internal

citation omitted).[3]

### B. Beauregard's PMWA claim is not preempted by the LMRA.

To determine whether LMRA preemption applies in this case, the Court first considers

whether the PMWA "confers nonnegotiable state-law rights on employers or employees."

*Lueck*, 471 U.S. at 213. The answer is straightforward. As discussed above, the PMWA was

intended to "protect[] an employee's right to be adequately compensated for all hours for which

they work." *Heimbach*, 255 A.3d at 200; *see also Chevalier*, 220 A.3d at 1055; 43 P.S.

§ 333.101. To give effect to that right, the PMWA affords an employee a civil cause of action to

---

[3] In addition to preempting certain state-law claims, the LMRA also precludes certain federal-law claims—for example, FLSA claims—that require interpretation of a collective bargaining agreement. *See Bell v. SEPTA*, 733 F.3d 490, 494 (3d Cir. 2013) ("[I]f a FLSA claim depends on the disputed interpretation of a CBA provision, an employee must first go to arbitration—through the representative union—before vindicating his or her rights in federal court under the FLSA."); *Vadino v. A. Valey Eng'rs*, 903 F.2d 253, 266 (3d Cir. 1990); *Oddo v. Bimbo Bakeries USA, Inc.*, 2017 WL 2172440, at *9 & n.9 (D.N.J. May 17, 2017). Given the significant overlap between LMRA preemption (*e.g.*, LMRA preempting a PMWA claim) and LMRA preclusion (*e.g.*, LMRA precluding a FLSA claim), courts often rely interchangeably on precedent involving either doctrine. *See, e.g.*, *LaRue*, 2020 WL 5747818, at *9–10; *Oddo*, 2017 WL 2172440, at *8; *Phila. Metal Trades Council v. Konnerud Consulting W., A.S.*, 2016 WL 1086709, at *4 (E.D. Pa. 2016).

recover minimum wages.  *See* 43 P.S. § 333.113.  And it further provides that "any agreement between the employer and the worker to work for less than such minimum wage shall be no defense to such action."  *Id.*  In other words, the PMWA expressly states that its protections cannot be waived by contract.  *See Verma*, 937 F.3d at 229 ("The whole point of . . . the PMWA is to protect workers by overriding contractual relations through statute.").  The Court, therefore, finds that the PMWA confers nonnegotiable rights on employees—a conclusion that follows directly from the text and purpose of the PMWA.

But the fact that a state law "grant[s] nonnegotiable rights" does not, by itself, "ensure[] nonpre-emption."  *Lingle*, 486 U.S. at 407 n.7.  Rather, such rights must also be "independent of any right established by contract," *Lueck*, 471 U.S. at 213, meaning adjudication of the state-law claim will not require "interpretation of a collective-bargaining agreement," *Lingle*, 486 U.S. at 413.  This inquiry is "riddled with nuance."  *Oddo v. Bimbo Bakeries USA, Inc.*, 2017 WL 2172440, *5 (D.N.J. May 17, 2017).  Nevertheless, the Court concludes that resolution of Beauregard's PMWA will not require interpretation of the PLA.  The state-law claim is "independent" of the PLA and is, therefore, not preempted by the LMRA.

To prevail on the PMWA claim, Beauregard must demonstrate that (1) he and the other hourly workers were "employees," (2) BESCO was their "employer," and (3) BESCO failed to pay them the wages required by the PMWA.  *See* 43 P.S. §§ 333.103, 333.104.  Resolution of the first two elements (which are inherently related) will not require any interpretation of the PLA.  "Whether a worker is an 'employee' subject to the protections of the PMWA is a fact-based inquiry regardless of what a contract says and even whether a contract exists at all."  *Soles v. Zartman Constr., Inc.*, 2014 WL 3557197, at *2 (M.D. Pa. July 18, 2014).  To determine employee-status, courts must consider the "totality of the circumstances" and apply a six-factor

"economic reality" test. *Stuber*, 822 A.2d at 873–74; *see also Verma*, 937 F.3d at 229. Notably, "none of [the six] factors asks whether the worker signed an agreement stating that she is an 'independent contractor'" or an 'employee.' *Verma*, 937 F.3d at 229. As such, the Court finds that application of the "economic reality" test to determine whether Beauregard and the other hourly workers were BESCO's employees will not require interpretation of any provision of the PLA. Indeed, the PLA is largely—if not entirely—irrelevant to this inquiry.

BESCO does not challenge that conclusion. Instead, BESCO focuses on the third element of the PMWA claim—whether it failed to pay its employees the statutorily required wages. Resolution of this element will require a factual determination of the amount of overtime the employees worked and a legal determination of whether such time is compensable under the PMWA. *See Bell v. SEPTA*, 733 F.3d 490, 495 (3d Cir. 2013); *see also LaRue*, 2020 WL 5747818, at *13; *Phila. Metal Trades*, 2016 WL 1086709, at *4. To be compensable as overtime, the employees must have worked "in excess of forty hours in a workweek," and their time must constitute "hours worked." *See* 43 P.S. § 333.104(a), (c). As defined by regulation, "hours worked" includes "[1] time during which an employee is required by the employer to be on the premises of the employer, [2] to be on duty or to be at the prescribed work place, [3] time spent in traveling as part of the duties of the employee during normal working hours and [4] time during which an employee is employed or permitted to work." 34 Pa. Code § 231.1(b).

BESCO asserts that determining whether the employees' pre- and post-shift activities constitute "hours worked" under the PMWA—*i.e.*, "whether BESCO employees are *required* to ride the shuttle busses and to don and doff their PPE [(personal protective equipment)] at the Monaca Facility"—will necessitate "interpretation of the PLA." (ECF No. 9, p. 12) (emphasis in original). Specifically, BESCO contends that "the terms of the PLA are *inextricably intertwined*

with Beauregard's PMWA claim because resolution of his claim necessarily raises *questions relating to an interpretation of the PLA's provisions*, i.e. what duties Beauregard and other Putative Class members were required to perform as part of their jobs under the PLA." (*Id.*) (emphasis in original). For support, it points to two decisions of the United States Court of Appeals for the Third Circuit. *See Pa. Fed'n of Bhd. of Maint. of Way Emps. v. Nat'l R.R. Passenger Corp. (AMTRAK)*, 989 F.2d 112 (3d Cir. 1993); *Smith v. Allegheny Techs., Inc.*, 754 F. App'x 136 (3d Cir. 2018).

In *AMTRAK*, employees responsible for constructing and maintaining the company's tracks, bridges, and facilities brought suit for unpaid overtime wages under the PMWA. 989 F.2d at 113–114. They alleged that AMTRAK assigned them to railroad cars for transportation to and from particular job sites, but it only paid them "straight-time pay for travel time falling outside the normal 40-hour work week." *Id.* at 114. The district court dismissed the case, holding that the PMWA claim was preempted by the Railway Labor Act ("RLA"), 45 U.S.C. § 153, because it required interpretation of a collective bargaining agreement. *Id.* at 113. The Third Circuit affirmed that decision on appeal. Despite the case concerning RLA preemption—not LMRA preemption—the court found that difference to be insignificant "because if anything preemption is broader under the [RLA]." *Id.* at 115 n.7. It thus applied LMRA precedent (specifically, *Lingle*, *Lueck*, and *Lucas Flour Co.*) and concluded that "in order to determine whether the workers are '*required by the employer* to be on the premises of the employer, to be on duty, or to be at the prescribed workplace' during the time spent traveling, [it] would have to interpret the collective bargaining agreement." *Id.* at 115. Notably, however, the Third Circuit did not explicate which particular provisions of the collective bargaining agreement would require interpretation.

Subsequent to *AMTRAK*, in *Smith*, strikebreaker employees filed suit under the PMWA and other statutes alleging that their employer failed to compensate them for travel time before and after their shifts, which involved "crossing picket lines and travelling to work in [the] employer's van[s]" from nearby, assigned hotels.  754 F. App'x at 138.  The district court held that the employees failed to state a claim under the PMWA, but a panel of the Third Circuit vacated that dismissal.  *Id.*  In a nonprecedential decision, the panel noted that "[t]here is a dearth of precedent interpreting when travel time is an employee's duty under the PMWA."  *Id.* at 140.  But it found *AMTRAK*'s holding—*i.e.*, that "the Pennsylvania travel regulation requires courts to inquire into the underlying employment agreement"—to be "instructive."  *Id.* at 141.  In discussing *AMTRAK*, the panel explained that "determin[ing] whether the uncompensated activity is required under the contract is consistent with a plain text reading of 'duties of the employee' under the regulation.'"  *Id.*  Nevertheless, the *Smith* panel ultimately resolved the appeal without any inquiry into the plaintiffs' employment agreements, which were "not in the record."  *Id.*  Instead, the panel noted that, at the dismissal stage, it was "required to accept as true the factual allegations of the complaint."  And it concluded that the employees adequately pleaded that "riding in [the employer's] vans was a duty of the employees and thus compensable under the PMWA."  *Id.*

Relying on *AMTRAK* and *Smith*, BESCO argues that, as a general matter, "[d]etermining what is 'required' of an employee and what is included in an employee's 'duties' requires interpretation of the collective bargaining agreement."  (ECF No. 12, p. 8).  It then undertakes a "Herculean effort"—albeit, only in its Reply Brief (*id.* at 11–15)—to show that resolution of Beauregard's particular PMWA claim will necessitate interpretation of several provisions of the PLA.  *LaRue*, 2020 WL 5747818, at *14.  The Court, however, is unpersuaded.  *AMTRAK* and

*Smith* stand for the commonsense proposition that an employee's required activities and duties may be deduced by looking to an applicable employment agreement or collective bargaining agreement. But those decisions do *not* hold that such an exercise will require interpretation—as opposed to mere consultation—of an employment agreement in each and every case.[4] Nor do they foreclose the equally commonsense proposition that, in some cases, determining the full extent of an employee's required activities or duties may call for consideration of facts and circumstances beyond the four corners of a written agreement. For example, an employment agreement might set forth the basic demands of a job, while additional materials—such as written policy statements, bulletins, or emails, or oral commands or instructions—might set forth the specific day-to-day demands. And where an employment agreement is silent (rather than ambiguous) as to certain job requirements, a court cannot be said to 'interpret' the agreement by making that determination of silence and then looking to external, non-contractual sources of those alleged requirements.[5] *See Kline v. Sec. Guards, Inc.*, 386 F.3d 246, 256 (3d Cir. 2004)

---

[4] Indeed, Judge Lewis's concurrence in *AMTRAK* expressed concern about courts failing to distinguish between "interpreting or construing a collective bargaining agreement, on the one hand, and merely referring to it on the other." 989 F.2d at 116 (Lewis, J., concurring). Only the former, after all, triggers LMRA preemption. But if courts erroneously conflate the two concepts, it would "insulat[e] entirely from judicial review the contents of a collective bargaining agreement." *Id.*

[5] Pennsylvania contract law is instructive here. "When the language of a contract is clear and unequivocal, courts interpret its meaning by its content alone, within the four corners of the document." *Banks Eng'g Co. v. Polons*, 697 A.2d 1020, 1023 (Pa. Super. 1997) (citation omitted). Conversely, "[w]hen the words used in a contract are ambiguous, a court may examine the surrounding circumstances to ascertain the intent of the parties" and, ultimately, interpret the contract. *Halpin v. LaSalle Univ.*, 639 A.2d 37, 39 (Pa. Super. 1994); *see also Banks Eng'g*, 697 A.2d at 1023 ("A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense."). But "when a contract does not provide for [something], it is not ambiguous; rather it is silent, and the court may not read into the contract something it does not contain and thus make a new contract for the parties." *Banks Eng'g*, 697 A.2d at 1023–24 (cleaned up). In the face of silence, then, a court does not—and cannot—engage in contractual interpretation because "courts are not generally available to

("[T]he mere fact that we must look at the CBA in order to determine that it is silent on any issue relevant to [a plaintiff's] state claims does not mean that we have 'interpreted' the CBA.").

*AMTRAK* and *Smith* thus do not mandate a finding of LMRA preemption in this case, as BESCO argues.  Instead, the Court must examine the PLA to determine whether any contractual interpretation will be required to resolve Beauregard's PMWA claim.  *See id.* ("[T]he essential question is not whether [a plaintiff's] claims relate to a subject . . . contemplated by the CBA. . . . Rather, the dispositive question [] is whether [the] state claims require any *interpretation* of a provision of the CBA.").  Upon careful review of the PLA, the Court finds no relevant provisions requiring interpretation.  Rather, the PLA is silent as to, first, whether Beauregard and the other employees were required to ride shuttle buses to and from the Monaca facility and, second, whether they were required to don and doff their PPE at the facility.  As to the first issue, the PLA simply states that, "from a remote parking lot or common park and ride area, the employer will furnish transportation to the project entrance prior to the shift starting time and . . . will furnish transportation from the exit gate to the remote parking facility or park and ride location at the shift quitting time."  (ECF No. 9-1, p. 57).  This provision speaks only to *BESCO's obligation* to provide transportation; it says nothing about the *employees' obligation* to utilize such transportation.  As to the second issue, the PLA states that employees are "required" to wear certain PPE, such as safety boots, long-sleeve shirts, colored vests, hard hats, and fire-retardant clothing.  (*Id.* at 63–64).  But it does not state whether employees must don and doff this PPE at the facility.

The PLA is thus silent as to whether any of the challenged pre- and post-shift activities were compensable "hours worked."  In other words, with respect to the third element of

---

rewrite agreements or make up special provisions for parties" who failed to include such provisions in the first place.  *Id.* at 1023 (citation omitted).

Beauregard's PMWA claim, there is nothing in the PLA for the Court—or an arbitrator—to interpret. Resolution of this element will ultimately require the Court to look beyond the PLA.[6] That task, as explained above, will not involve contractual interpretation. And in the absence of any required interpretation of a collective bargaining agreement, the doctrine of complete preemption under the LMRA is inapplicable. *See Lingle*, 486 U.S. at 413 ("[A]n application of state law is preempted by § 301 of the [LMRA] only if such application requires the interpretation of a collective-bargaining agreement."); *Kline*, 386 F.3d at 257 ("The fact that a collective bargaining agreement [is] part of the context in which an employee's claim must be addressed [does] not trigger complete preemption in the absence of some substantial dispute over the meaning of the collective bargaining agreement."). The Court, therefore, concludes that Beauregard's PMWA claim is not preempted by Section 301 of the LMRA.[7]

---

[6] At the dismissal stage, the Court may only consider the well-pleaded allegations in the Complaint. Beauregard has sufficiently pleaded that he and other employees were required to ride shuttle buses to and from assigned parking lots and to don and doff their PPE at the facility. (ECF No. 1-1, ¶¶ 10–11). *See, e.g.*, *Smith*, 754 F. App'x at 141 (finding that plaintiffs "have adequately pled that riding in [the employer's] vans was a duty of the employees and thus compensable under the PMWA"); *Lugo v. Farmers Pride, Inc.*, 967 A.2d 963, 967–68 (Pa. Super. 2009) ("If the averments of the complaint are proven true, then clearly the PMWA would consider the time spent donning, doffing, and sanitizing the protective gear as part of the 'hours worked' and for which appellants would be owed wages under the PMWA.").

[7] This holding is in accord with Judge Cercone's decision in *LaRue v. Great Arrow Builders LLC*, 2020 WL 5747818 (W.D. Pa. Sept. 25, 2020)—a nearly identical, but nonetheless separate, case involving the same facility, the same collective bargaining agreement, and the same alleged violations of the PMWA. The Court finds that decision to be persuasive, notwithstanding BESCO's repeated assertions that *LaRue* was "wrongfully decided, and clearly so." (ECF No. 9, pp. 4, 13–21). Having conducted its own "independent analysis" in this near-identical case, *Threadgill v. Armstrong World Indus., Inc.*, 928 F.2d 1366, 1371 (3d Cir. 1991), the Court reaches the same conclusion as in *LaRue*—the plaintiff's PMWA claim does not trigger LMRA preemption.

## IV.   CONCLUSION

For the foregoing reasons, the Court will deny BESCO's Motion to Dismiss (ECF No. 8).

An Order of Court will follow.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

Dated:

6/24/22